IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PUBLICATIONS INTERNATIONAL, LTD.,
an Illinois Corporation,

                              Plaintiff,

v.

LEAPFROG ENTERPRISES, INC.,
a Delaware Corporation,

                              Defendant.

08-cv-2800

JUDGE GUZMAN

MAGISTRATE JUDGE COX

**PIL'S MEMORANDUM OF LAW IN OPPOSITION TO
LEAPFROG'S  MOTION TO DISMISS**

       Leapfrog's Motion to Dismiss ("Motion") attempts to distance LeapFrog from a month of written and oral rhetoric during which it all but promised to bring Publications International, Ltd. ("PIL") into Court.  At the time PIL received these thinly veiled threats, it was investing large amounts of money, time, and energy into the continued development and marketing of PIL's POINGO electronic reading pen product, which it introduced in February 2008 at the American International Toy Fair ("Toy Fair") and for which it took orders that it will fulfill within what is now only a matter of a few weeks.

       It is precisely this scenario that the Declaratory Judgment Act was created to remedy. There is no support in Article III that a  plaintiff should be required to "bet the farm" and risk damages prior to obtaining a declaration of its "actively contested legal rights."  *See MedImmune, Inc. v. Genetech, Inc.*, 127 S.Ct. 764, 775 (2007).  For this reason alone, LeapFrog's motion should be denied.  LeapFrog's motion on PIL's Illinois Count is similarly misdirected.

I.  **INTRODUCTION**

In 2006, PIL began developing an electronic reading pen product for children. (Amended Complaint ("Am. Cmpt."), ¶ 11; Declaration of Louis Weber ("L. Weber Decl."), ¶ 2). Notwithstanding countless hours of development time, completed books, and a completed electronic pen design, by early 2008 PIL had been unable to settle on a suitable name for its new product.  (L. Weber Decl., ¶ 2).  PIL considered it a priority to introduce its new product, under its new name, at the American International Toy Fair in February, 2008 ("Toy Fair").  (*Id.*, ¶ 2).

Faced with a short amount of time to get the marketing materials for the electronic reading pen product ready for the Toy Fair, PIL enlisted the help of a third-party branding company.  (*Id.*, ¶ 3).  Once PIL decided to use the name POINGO, it moved full-steam ahead with production of packaging and advertising materials.  (*Id.*, ¶¶ 3, 4).  As planned, PIL was able to debut its POINGO™ electronic reading pen product at the Toy Fair.  (L. Weber Decl., ¶ 4 at Exh. A).

Since Toy Fair, PIL has produced thousands of boxes and thousands of books both bearing the POINGO trademark, and has completed production of thousands of the pen-like electronic reader devices in the Orient also bearing the POINGO trademark.  (L. Weber Decl., ¶¶ 5, 7 at Exhs. B,C).  Several thousand of the POINGO™ pen-like electronic reader devices along with books bearing the POINGO trademark have been produced and packed into POINGO™ gift boxes and then into shipping boxes and into containers where they sit on the ocean headed for the United States.  (L. Weber Decl., ¶ 5).  As a result, PIL has invested substantial amounts of money in getting its POINGO™  product ready for market and has received orders from multiple third parties who plan to sell that product.  (L .Weber Decl., ¶ 7,9).

While PIL was ramping up its efforts to ensure its POINGO™ product was in stores for a summer 2008 launch, LeapFrog first contacted PIL regarding the POINGO name.  (Am. Cmpt., ¶ 20).  In LeapFrog's first letter, dated April 7, 2008, LeapFrog's counsel stated in no uncertain terms that "LeapFrog's long prior use of the coined mark POINGO within LeapFrog indicates

that PIL's decision to use the same mark may be due to PIL's misappropriation of LeapFrog's confidential and proprietary information."  (Am. Cmpt., ¶ 21 at Exh. A).

PIL timely replied to LeapFrog's letter, informing LeapFrog that PIL was unaware of any prior use of the mark POINGO by LeapFrog, asking for additional information on that use, and telling LeapFrog that PIL took very serious any allegation of misappropriation of confidential and proprietary information.  (Am. Cmpt., ¶ 23 at Exh. B).  LeapFrog replied and again stated that "PIL's decision to use the exact same mark may be due to PIL's misappropriation of LeapFrog's confidential and proprietary information."  (Am. Cmpt., ¶ 24 at Exh. C).

Following the exchange of these letters, outside counsel for both parties participated in a telephone conference.  (Am. Cmpt., ¶ 25;  Declaration of Dorothy M. Weber ("D. Weber Decl."), ¶ 5; Declaration of William R. Golden, Jr. ("Golden Decl."), ¶ 3).  During this call, LeapFrog's counsel made clear that LeapFrog would not shirk from using litigation, for example by stating that LeapFrog could obtain the information it needed through "discovery" if PIL did not comply with LeapFrog's demands.  (Am. Cmpt., ¶ 25; D. Weber Decl., ¶ 6; Golden Decl., ¶ 4).  The three attorneys who participated in that call on PIL's behalf (each from separate physical locations) all had the same independent impression at the call's conclusion – namely, that LeapFrog would be suing PIL.  (D. Weber Decl., ¶ 8; Golden Decl., ¶ 6).

LeapFrog may now wish its outside counsel adopted a softer tone, but the facts remain that he did not.  LeapFrog's counsel evoked language that conveyed the clear impression to three separate lawyers in three separate offices that LeapFrog was on the verge of suing PIL if it did not cease its use of the mark POINGO.  So, now based on revisionist history LeapFrog argues that PIL cannot meet the standard for declaratory judgment.  PIL not only can, but has met the standard in its Amended Complaint.

PIL believes that LeapFrog's allegations and accusations are intended to have a chilling effect on PIL's entry into the relevant market.  (L. Weber Decl., ¶ 10).  PIL is especially concerned about the reactions of third parties to LeapFrog's allegations against PIL, and in

particular those who license content and those who sell the products. *(Id)*.  In the end, this chilling effect and the reactions of third parties will impact the ability of consumers to obtain PIL's electronic reading pen product.  While LeapFrog is of course allowed to compete fairly, the law will not now permit it to use unsubstantiated threats and allegations to squeeze its competitors out of the market.


## II.    ARGUMENT

### A.    Standard on Motion to Dismiss

When deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *McMillan v. Collection Prof'ls Inc.*, 455 F.3d 754, 758 (7th Cir. 2006).  A court may dismiss a claim "only if the complaint fails to set forth 'enough facts to state a claim to relief that is plausible on its face.'"  *St. John's United Church of Christ v. Chicago*, 502 F.3d 616, 625 (7th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007)).  The motion should be denied if "relief could be granted under any set of facts that could be proved consistent with the allegations."  *McMillan*, 455 F.3d at 758.


### B.    PIL Has Met the Burden for Declaratory Judgment Jurisdiction because the Parties have Adverse Legal Interests of Sufficient Immediacy and Reality

The Declaratory Judgment Act provides "[i]n a case of actual controversy within its jurisdiction  . . . any court of the United States, upon filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a) (2000).  The Act exists

"to prevent avoidable damages from being incurred by a person uncertain of his rights and threatened with damage by delayed adjudication." *Minn. Mining & Mfg. Co. v. Norton Co.*, 929 F. 2d 670, 673 (Fed. Cir. 1991).

 1) In-a post-*MedImmune* World Immediate and Real Legal Adversity is All that Matters

In *MedImmune, Inc. v. Genetech,* the Supreme Court drastically altered the legal landscape surrounding declaratory judgment jurisdiction. 127 S.Ct. 764 (2007). Before *MedImmune*, courts applied a two-part test to claims of declaratory judgment. Specifically, courts required that for an actual controversy to exist, there must be both (1) action by the patent or intellectual property ("IP") holder causing the declaratory plaintiff to believe there is a reasonable apprehension of an infringement suit; and (2) present action by the declaratory plaintiff that the IP rights holder alleges infringes the IP, or concrete steps taken by the declaratory plaintiff with the intent to conduct such activity. *Holley Performance Prods., Inc. v. Barry Grant, Inc.*, No. 04 C 5758, 2004 U.S. Dist. LEXIS 25892, at * 5 (N.D. Ill. Dec. 17, 2004).

In *MedImmune,* the Supreme Court rejected the "reasonable apprehension of liability" prong. 127 S.Ct. at 771. Since then, courts have consistently held that "it is clear that a declaratory judgment plaintiff does not need to establish a reasonable apprehension of a lawsuit in order to establish that there is an actual controversy between the parties." *Sony Elecs., Inc. v. Guardian Media Techs., Ltd.*, 497 F.3d 1271, 1284 (Fed. Cir. 2007); *see also Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330, 1339 (Fed. Cir. 2007); *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1380 (Fed. Cir. 2007).[1] Instead, following *MedImmune*, a court must decide "whether the facts alleged, under all the circumstances, show

---

[1] When faced with declaratory judgment actions involving trademark infringement, the Seventh Circuit "has looked to patent infringement cases for the requirements for establishing an actual controversy," and consequently often look to Federal Circuit authority. *Giesha, LLC v. Tuccillo,* 525 F.Supp.2d 1002, 1010 (N.D. Ill. 2007).

that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." 127 S.Ct. at 771 (citing *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273 (1941)).

In the wake of *MedImmune*, courts have focused on "whether the potential infringer's proposed future activities were definite enough, or had progressed sufficiently, to create a real and immediate threat of infringement" in deciding whether declaratory judgment jurisdiction exists. *Geisha, LLC v. Tuccillo,* 525 F. Supp.2d 1002, 1013-1018 (N.D. Ill. 2007) (internal citations omitted); *Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340 (Fed. Cir. 2007) (plans to file a New Drug Application in a few years, discussions with an unnamed potential costumer, and vaguely defined expansion plans do not meet the immediacy and reality requirement); *Cat Tech LLC v. Tubemaster, Inc.*, No. 2007-1443, 2008 U.S. App. LEXIS 11377 at *20-24 (Fed. Cir. May 28, 2008) (significant, concrete steps taken to produce the product satisfy the "constitutionality mandated immediacy [and] … reality requirements").

> 2)    PIL Can Show an Actual Controversy with LeapFrog because It Has Taken Concrete Steps with Real and Immediate Legal Consequence

The factual circumstances show that an "actual controversy" exists between the parties of sufficient immediacy and reality to warrant the court's finding of declaratory judgment jurisdiction based on the factors considered by post-MedImmune courts.[2]  Here, not only did PIL introduce its POINGO™ reader product at Toy Fair this past February with then announced plans to release the POINGO™ reader this summer, it has since invested millions of dollars in products, packaging, and marketing materials marked with the POINGO trademark; and PIL has received orders from multiple third parties planning to sell its POINGO™ products.  (L. Weber Decl., ¶¶ 4-9).  In fact, a significant number of the packaged POINGO™ products are already on

---

[2] PIL even would have met the standard under the pre-*MedImmune* two-prong test.  PIL did have a reasonable apprehension of liability after the letter exchange and the telephonic meeting between the parties.  (D. Weber Decl., ¶ 8; Golden Decl., ¶ 6).

6

ships that sailed from the Orient. (L. Weber Decl., ¶ 5). Any purported trademark infringement is only days or weeks away and the alleged misappropriation has taken a highly concrete form.

      3)    <u>PIL has Meaningfully Prepared to Sell and Distribute its POINGO™ Product</u>

Courts consider whether there has been "meaningful preparation" for making or using the product, and, in particular, whether the product is "substantially fixed" and not "fluid and indeterminate." *See Cat Tech,* 2008 U.S. App. LEXIS 11377 at *20, 24. In *Cat Tech*, the Court determined that significant, concrete steps to produce an allegedly infringing product, and at least one delivery of the product, had satisfied the constitutionally-mandated immediacy requirement. *Id*. at *22. The *Cat Tech* Court further opined that once the threat of liability had been removed, TubeMaster could solicit and fill orders for its product, and that TubeMaster met the requirement of "reality" because the product was "substantially fixed" as TubeMaster did not plan to make any substantial modifications to the product. *Id*. at *23-27.

Not only was a working version of PIL's POINGO™ product shown at the Toy Fair, millions dollars in POINGO™ products have already been produced and at least ten thousand POINGO™ units have already been shipped to United States. (L. Weber Decl., ¶¶ 4-7). In fact, PIL has been marketing the product to retailers under its POINGO trademark, launched its mypoingo.com website, and provided POINGO™ reader sales literature to its customers. (L. Weber Decl., ¶¶ 7-9). It follows that the product and its marketing materials, and the trademark usage must be completely fixed to have reached this stage of business activity. *Compare Int'l Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1216 (7th Cir. 1980) (holding that declaratory judgment is improper when the design of the product may not be the design which is ultimately produced and marketed); *see also Cat Tech*, 2008 U.S. App. LEXIS 11377 at *26-27, *infra*.

Moreover, unlike the cases relied on by LeapFrog, a significant aspect of this dispute is an alleged trademark rather than patent infringement. It cannot be seriously disputed that PIL has completed the naming of its product. Its product has already been marketed and

manufactured with the name POINGO. Accordingly, if LeapFrog was corrected in its pre-litigation assertions (a point PIL certainly does not concede), PIL may already be subject to trademark infringement liability.

### 4) PIL is At Most Weeks Away From Retail Sales of its POINGO™ Product

Post-*MedImmune* courts have also looked to the amount of time before the potentially infringing activity is expected to occur. *Benitec*, 495 F.3d at 1346 ("The fact that Nucleonics may file an NDA in a few years does not provide the immediacy and reality required for a declaratory judgment"); *see also Telectronics Pacing Sys., Inc. v. Ventritex, Inc.*, 982 F.2d 1520, 1527 (Fed. Cir. 1992) ("At the commencement of the suit, Ventritex's device had only recently begun clinical trials, and was years away from potential FDA approval"; therefore "the case lacked sufficient immediacy and reality to meet the actual controversy"). The greater the length of time before the potential infringement occurs, the more likely the case does not meet the immediate standard. *See Cat Tech,* 2008 U.S. App. LEXIS 11377 at *20. PIL's POINGO products are expected to reach the United States at about the same time LeapFrog will be filing its Reply papers. (L. Weber Decl., ¶ 6). In fact, the first retailer is expecting delivery of 10,000 POINGO™ units from PIL on or before August 10, 2008. (*Id*). It is hard to fathom a more immediate and real case, let alone one that could be successfully challenged as lacking an actual controversy as LeapFrog must prove to succeed in the present motion.

Courts have also looked to the parties' positions before filing the suit, in particular whether there have been claims of infringement, whether the parties have adverse positions, and whether the parties have sufficiently identified the basis for their positions. *Geisha,* 525 F. Supp.2d 1017-18. Unlike in *Geisha,* where the parties merely exchanged one set of letters vaguely discussing the matter (*id.* at 1017-18), PIL and LeapFrog corresponded at least three times, twice in letters and once in a telephonic meeting between counsel. (Am. Cmpt., ¶¶ 20-25). Through this string of correspondence LeapFrog's counsel alleged that LeapFrog has

priority trademark rights to the use of the mark POINGO and that PIL's decision to use the mark may be due to PIL's misappropriation of LeapFrog's confidential and proprietary information. (*Id*). After the letters and call, PIL's counsel was convinced that the parties had adverse interests and that LeapFrog intended to act, most likely by filing suit. (Am. Cmpt., ¶ 25; D. Weber Decl., ¶ 8; Golden Decl., ¶ 6).[3]

PIL's Amended Complaint meets both the "immediate" and "real" requirements to establish declaratory judgment jurisdiction. So, PIL respectfully requests that the Court deny LeapFrog's motion to dismiss for lack of declaratory judgment jurisdiction.

> 5)     LeapFrog's Reliance on Case Law that Finds No Declaratory Jurisdiction Based on the Lack of "Reasonable Apprehension of Liability" is Inappropriate

LeapFrog's reliance on *American Needle* and *Holley Performance Prods.* (Motion at 7) is misplaced. Both cases were decided under the pre-*MedImmune* standard. Furthermore, both cases are factually distinct from the present case. In both *American Needle* and *Holley Performance Prods.*, the argument involved whether a single letter questioning the alleged infringers' position on certain potentially infringing products could establish a "reasonable apprehension of liability." *American Needle and Novelty Co. v. Schuessler Knitting Mills, Inc.*, 379 F.2d 376, 379; *Holley*, 2004 U.S. Dist. LEXIS 25892 at *9-12. In neither case did the declaratory judgment plaintiff ever reply, or ever engage in any conversation with the patentee. *American Needle,* 379 F.2d at 378; *Holley Performance Prods., Inc*, 2004 U.S. Dist. LEXIS 25892 at *5-6. Instead, both plaintiffs ran straight to the courthouse. *American Needle,* 379 F.2d at 378; *Holley*, 2004 U.S. Dist. LEXIS 25892 at *6.

The instant situation is different not only in number, but in kind. The parties discussed the mark POINGO and the trade secret misappropriation allegations at least three times. (Am.

---

[3] In fact, the tone of the communications was such that PIL would even have met the declaratory judgment standard under the pre-*MedImmune* two-prong test. (D. Weber Decl. ¶ 8; Golden Decl., ¶¶ 3-6).

Cmpt., ¶¶ 20-25). LeapFrog never suggested any doubt of infringement; it only questioned the genesis of PIL's mark. (Am. Cmpt., ¶¶ 20, 21, 24, 25). PIL responded to each letter LeapFrog sent. (Am. Cmpt., ¶ 23). Based on the continuing dialog and the tenor and content of the final teleconference, PIL believed a lawsuit was inevitable if not imminent. (Am. Cmpt., ¶ 25; D. Weber Decl., ¶ 8; Golden Decl., ¶ 6).

LeapFrog's reliance on *Geisha* (Motion at 8) is also misplaced. In fact, the only similarity is that both in cases the parties own an intent-to-use trademark. *See Geisha*, 525 F.Supp.2d at 1004. Although the alleged trademark infringer in *Geisha* claimed plans to open a restaurant under the mark, he could not show any investment in the mark or any concrete plans to use the mark. *Id.* at 1015-17. To the contrary, the defendant's "actual preparations for opening a restaurant [did] not appear to have advanced significantly beyond [the] statement of intent" found in his trademark application. *Id.* at 1015. In contrast, PIL has produced packaging material with the POINGO mark, developed a website with the POINGO mark, developed point of purchase displays, and has outstanding orders for its product to be delivered to retailers. (L. Weber Decl., ¶¶ 4-9). PIL's investments – both in time and money – explain why a final determination of its rights is both appropriate and crucial to PIL.

LeapFrog also misconstrues the law by making the blanket statement that "disputes over 'allegedly infringing future uses' do not support declaratory relief jurisdiction." (Motion at 8). In fact, nowhere does the *Geisha* Court indicate that it intended to make such a broad new rule. *Geisha,* 525 F.Supp.2d at 1018. The proper test, as stated above, is whether there has been meaningful preparation to conduct potentially infringing activity, and this is also an important element in the totality of circumstances that are reviewed when determining whether there is declaratory judgment jurisdiction. *See Teva,* 482 F.3d at 1339.

PIL would have met the standard even if LeapFrog were correct that no "allegedly infringing future uses" could serve as the basis for declaratory relief jurisdiction. PIL has publicly used its POINGO mark at the Toy Fair, has a website up and running, is within a few

weeks of having its product on retail shelves, and third-party media has referred to POINGO in publications.  *See Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 433-434 (7th Cir. 1999); (L. Weber Decl., ¶¶ 4-9; Declaration of Julie Samuels ("J. Samuels Decl."), ¶¶ 1,2 at Exhs. A, B).[4]

PIL has met both the "immediate and real" requirements to establish declaratory judgment jurisdiction, and PIL respectfully requests that the Court deny LeapFrog's motion to dismiss the Counts of PIL's Amended Complaint related to PIL's trademark rights and the alleged misappropriation of trade secrets for lack of declaratory judgment jurisdiction.

C.      **PIL Has Alleged the Required Elements of the Consumer Fraud Act**

The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP. STAT 505/2 (1992) was enacted to protect consumers from all types of unfair business practices. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403, 416-417 (2002).  An individual consumer is not the only party vested with the power to enforce consumers' rights; indeed, businesses may move to protect their consumers.  *Gold v. Golden G.T., LLC*, No. 05 C 288, 2005 U.S. Dist. LEXIS 22691, *11 (N.D. Ill. Oct. 4, 2005).  By bringing its claim under that Act, PIL is doing just that – protecting consumers by ensuring that vibrant competition exists for new and exciting products.

---

[4] LeapFrog takes the position that it is part of PIL's burden at this state of the pleading to allege how it came up with the name POINGO.  To the contrary, PIL only has to allege that is had a legal right to use the mark POINGO, and PIL violated no duty to LeapFrog.  *Milgram on Trade Secrets* § 16:01(3)(b) (2008).  PIL has filed intent to use applications on the mark POINGO, which establishes PIL's legal right in the mark, and to PIL's knowledge, LeapFrog does not have rights to the mark POINGO.  (Am. Cmpt., ¶¶13,22).

    1)    <u>PIL Has Alleged That LeapFrog's Conduct Implicate Consumer Protection Concerns</u>

The Consumer Fraud Act grants businesses standing to bring a claim against another businesses, so long as the moving party can meet the consumer nexus test. *Pace Am., Inc. v. Elixir Indus.*, No. 06 C 4661 , 2007 U.S. Dist. LEXIS 10601 at *13 (N.D. Ill. Feb. 13, 2007). In particular, the Consumer Fraud Act "seeks to protect businesses from 'fraud and unfair competition,' … thus allowing businesses … to bring suits as 'representatives of the consumer interest.'" *Gold,* 2005 U.S. Dist. LEXIS 22691 at *11-12 (internal citations omitted). The consumer nexus test specifically requires that the complained-of conduct involve trade practices directed to the market generally or that otherwise implicates consumer protection concerns. *Athey Products Corp. v. Harris Bank Roselle*, 89 F.3d 430, 436-37 (7th Cir. 1996). PIL has alleged that LeapFrog's conduct lessens consumer choice and may lead to price control, thus stating its case that LeapFrog's actions indeed implicate consumer protection concerns.

LeapFrog's actions and accusations, alleging violations of its purported intellectual property rights, and threats of litigation, have a direct effect on PIL's past, current, and continuing interest in the electronic publication product market. In particular, LeapFrog's bullying behavior sends a clear message to its competitors, such as PIL, to get out of our market. Instead of relying on its TAG™ pen reader product to compete solely on the merits with PIL's POINGO product in the marketplace, LeapFrog has attempted to threaten and intimidate PIL. These threats and intimidation are actionable under the Consumer Fraud Act when, as here, they directly implicate consumer interests.

Since LeapFrog's TAG™ product is already available in the marketplace, the longer LeapFrog can keep PIL's competitive reader product off shelves (such as through the assertion of bogus trademark and misappropriation claims), the longer LeapFrog will be able to control pricing and limit consumer choice, which has an obvious negative impact on consumers. *Williams Electronic Games, Inc. v. Garrity*, 366 F.3d 569, 579 (7th Cir. 2004) (costs that are passed to onto consumers in the form of higher prices harms consumers and implicates consumer

protection interests). Because LeapFrog's allegations have had a chilling effect on PIL's past, current, and continuing interest in the electronic publications product market (Am. Cmpt., ¶ 35), and because PIL has further alleged that this diminished interest will lessen consumer choice in the market for those goods (*id.*), PIL has successfully pled its case under the Consumer Fraud Act.[5]

     2)   <u>PIL Has Established the Factors Necessary to Allege LeapFrog's Course of Conduct Is Unfair</u>

As LeapFrog correctly states in its Motion, a court should consider three factors when determining if a party's conduct is unfair: "(1) whether the practice offends public policy, (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers." (Motion at 12 (citing *Robinson*, 201 Ill.2d 403 at 417-18)). The complained-of acts do not need to meet all three criteria; rather they may meet one criterion to a high degree, or they may meet all three criteria to a lesser extent. *Id* at 1018. Nonetheless, PIL's complaint includes allegations that meet each of the three criterion. First, LeapFrog's actions violate public policy because, by attempting to scare competitors out of the marketplace, LeapFrog lessens consumer choice, which implicates a clear public policy concern. *See, e.g.,* 740 ILL. COMP. STAT 10/3 (2008), ("Illinois Antitrust Act"); 15 U.S.C. § 1 (1890) ("Sherman Act"); *Sadowski v. Med1 Online, LLC*, No. 07 C 2973 , 2008 U.S. Dist. LEXIS 41766 at * 19 (N.D. Ill. May 27, 2008) (a practice violates public policy if "it violates a standard of conduct set out by an existing statute or common law doctrine that typically governs such situations").

---

[5] LeapFrog relies on *Junction Solutions, LLC v. MBS Dev, Inc., et al.* to argue that it would only be liable if its allegations and accusations were made public. No. 06 C 1632 , 2007 U.S. Dist. LEXIS 86953 (N.D. Ill. November 20, 2007); Motion at 11. LeapFrog's reading of *Junction Solutions* misses the mark. That case involved an action for fraud under the Consumer Fraud Act. The Consumer Fraud Act envelopes many potential harms. One of those is fraud, of which an element is proof of a misstatement. *See, e.g. Pawlikowski v. Toyota Motor Credit Corp.*, 309 Ill. App. 3d 550, 563-64 (1999). In this case, PIL competently alleges that LeapFrog engaged in unfair methods of competition and unfair or deceptive acts or practices. Public misstatements are an element of neither cause of action.

Second, PIL has alleged conduct of LeapFrog's that is oppressive.  Generally, "conduct is oppressive only if it imposes a lack of meaningful choice or an unreasonable burden on its target."  *Centerline Equip. Corp. v. Banner Pers. Serv.*, 545 F. Supp. 2d 768, 780 (N.D. Ill. 2008).  Indeed, LeapFrog's conduct will clearly limit consumer choice if PIL leaves the market.  Finally, LeapFrog's practice causes substantial injury to consumers.  Generally, costs that are imposed on an unwilling costumer constitute a substantial injury.  *Id*.  The lack of competition that would result from LeapFrog's strong-arm tactics will lead to raised prices, which will cause a substantial injury to an unwilling costumer.

PIL has sufficiently plead each of the three factors that courts look to in determining unfairness.  Indeed, as discussed above, PIL need only prove one of those three to be successful on its claim.  Thus, PIL has met – and surpassed – its burden at the pleading stage.  Consequently, LeapFrog's motion to dismiss PIL's Consumer Fraud claim should also be denied.

## III.    <u>CONCLUSION</u>

PIL has met its burden under the Federal Rules by pleading all the elements needed for the Court to retain jurisdiction in this matter to issue a declaratory judgment.  LeapFrog's thinly veiled threats and PIL's substantial investments in its POINGO™ pen-like electronic reader devices show that the harm of which PIL is concerned is both actual and imminent.  Likewise, PIL sufficiently plead the elements of the Illinois Consumer Fraud Act by alleging that LeapFrog's actions are both unfair and implicate consumer protection concerns.

For these reasons, set forth more fully above, PIL respectfully requests that LeapFrog's motion to dismiss be denied in its entirety.

Date:  July 21, 2008                    Respectfully submitted,

                                        By:     _s/ Jordan A. Sigale_____
                                                Jordan A. Sigale
                                                Julie P. Samuels
                                                Julie L. Langdon
                                                LOEB & LOEB LLP
                                                321 North Clark Street, Suite 2300
                                                Chicago, IL 60610
                                                Telephone:  (312) 464-3100
                                                Fax:  (312) 464-3111

                                                Dorothy M. Weber
                                                SHUKAT ARROW HAFER WEBER &
                                                HERBSMAN, L.L.P.
                                                111 West 57th Street, Suite 1120
                                                New York, New York 10019
                                                Telephone (212)245-4580
                                                Attorneys for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 21st day of July, 2008, a copy of the foregoing PIL'S MEMORANDUM OF LAW IN OPPOSITION TO LEAPFROG'S MOTION TO DISMISS, THE DECLARATION OF LOUIS WEBER, THE DECLARATION OF DOROTHY M. WEBER, THE DECLARATION OF WILLIAM R. GOLDEN, JR., AND THE DECLARATION OF JULIE P. SAMUELS were filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.:


Michele Katz

Julie Katz

WELSH & KATZ, LTD.

120 S. Riverside Plaza, 22nd Floor

Chicago, IL 60606

(312) 655-1500

Timothy Cahn

TOWNSEND AND TOWNSEND

AND CREW LLP

Two Embarcadero Center, 8th Floor

San Francisco, CA 94111

(415) 273-7533


_/s Julie P. Samuels_____

Julie P. Samuels

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PUBLICATIONS INTERNATIONAL,
LTD.

                        Plaintiff,            08-cv-2800

v.                                            Judge Guzman
                                              Magistrate Judge Cox

LEAPFROG ENTERPRISES, INC.
                        Defendants.

## DECLARATION OF LOUIS WEBER

I, Louis Weber, declare as follows.

    1.    I am CEO of Publications International, Ltd.'s ("PIL"). In that capacity, I oversee and provide direction for PIL's product development, among other things  I have personal knowledge of the facts stated herein, except those that are stated on information and belief, and can testify competently thereto.

    2.    In the fall of 2006, PIL began developing a pen-like electronic reader device that houses a computer processor and optical sensor. Although we had spent considerable time and energy to come up with a name for that pen-like reader product, by early 2008 we still had not selected a suitable name. It was very important for PIL to introduce its new pen product by name at the American International Toy Fair in February, 2008.

3.     With the assistance of a third-party branding company, PIL chose the name POINGO for its new pen-like electronic reader device.

4.     Upon deciding on the name POINGO, PIL pushed forward with production of packaging and advertising materials. For, instance, at Toy Fair, PIL prominently displayed the POINGO name and product in its booth, as shown in the photos attached as Exhibit A.

5.     PIL has produced thousands of boxes with the POINGO trademark, as shown in the photo attached as Exhibit B. PIL has further completed production of thousands of pen-like electronic reader devices in the Orient, several thousand of which have been packed into the gift boxes and then into shipping boxes and containers where they sit on the ocean headed for the United States.

6.     PIL has committed to having its POINGO product appear on the shelves beginning in August 2008 in stores such as Wal-Mart.

7.     PIL has invested millions of dollars in developing and producing the packaging for the POINGO product as well as in the products (books and pens) themselves each of which are labeled with the POINGO name, as shown in Exhibit C attached hereto

8.     PIL has also invested money and resources into the POINGO web site at **www.mypoingo.com**. That website is up and running since May, 2008.

9.     PIL has also received verbal commitment from at least ten major buyers representing approximately 10,000 stores where this product will be sold. While these verbal offers are customary in the industry, PIL is concerned that they could easily be rescinded if this dispute continues.

10.     I believe that Leapfrog's actions threatening PIL are intended to have a chilling effect on PIL's entry into the electronic publication products market.  In particular, I am concerned about the reactions of third parties – such as those who license content and those who sell the products – to Leapfrog's allegations.

11.     PIL has invested large sums of money, time, and energy into development of its POINGO product, and we hope and plan to see it on store shelves shortly.

Executed on this 17 th day of July 2008 in Lincolnwood, Illinois.

Louis Weber

EXHIBIT A



EXHIBIT B





# EXHIBIT C

log-in



 

# What is Poingo™?

Poingo™ is the next generation of interactive books from the makers of Story Reader®. Children ages 3 to 7 will love the adventure of unlocking hidden treasure on every page. Kids touch pictures or text and bring their favorite characters to life with words, sounds, and music.





**With Poingo™, books come alive in three easy steps**

**1** Turn "ON" Poingo™

**2** Point to a word or picture.

**3** Experience the magic of favorite Disney® stories come to life.









my**poingo**.com

ALL RIGHTS RESERVED © 2008 POINGO

ABOUT US  |  INTERNATIONAL  |  PRIVACY POLICY  |  LEGAL TERMS  |  SITE MAP

**EXHIBIT 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PUBLICATIONS INTERNATIONAL,
LTD.

                              Plaintiff,                    08-cv-2800

v.                                                          Judge Guzman

                                                           Magistrate Judge Cox

LEAPFROG ENTERPRISES, INC.

                              Defendants.

## DECLARATION OF DOROTHY M. WEBER

I, Dorothy M. Weber, declare as follows.

1.       I am an attorney in the law firm of Shukat Arrow Hafer Weber &

Herbsman, L.L.P., licensed to practice to law in the state of New York.  I am intellectual

property counsel to Plaintiff Publications International, Ltd. ("PIL") and have represented

them since approximately 1986.  I have personal knowledge of the facts stated herein,

except those that are stated on information and belief, and can testify competently

thereto.

2.       I received a copy of John Hughes' April 7, 2008 letter to Richard Maddrell

shortly after Mr. Maddrell received that letter.  A true and correct copy of the April 7

letter is attached hererto as Exhibit A.

CH44362.1
211876-10002

3.     I responded on PIL's behalf to Mr. Hughes by letter dated April 14, 2008. I received a response from Mr. Hughes on April 17, 2008. True and correct copies of the April 14 and April 17 letters, respectively, are attached hereto as Exhibits B and C.

4.     William Golden, Esq. who has acted as litigation counsel to PIL on various matters, sent Mr. Hughes a letter on April 30, 2008, requesting that the parties have a telephone conference. A true and correct copy of that letter is attached hereto as Exhibit D.

5.     On May 7, 2008, I participated in a phone conference with Mr. Hughes, Mr. Golden, and Michelle Graham, Mr. Golden's partner. During the course of that call, Mr. Hughes never stated that Leapfrog did not intend to sue PIL.

6.     On the contrary, Mr. Hughes stated several times that if we didn't provide the information he was demanding, he would "get it in discovery."

7.     Mr. Hughes went on to say that it was "impossible" that PIL had come up with the name POINGO independently and it was clear PIL had "improperly" obtained Leapfrog's confidential information.

8.     At the conclusion of that call, it was apparent to me based on the tone of the conversation, and Mr. Hughes repeated statements that Leapfrog intended to get material "in discovery", that Leapfrog intended to pursue its legal remedies in Court.

9.    After the call I spoke with both Mr. Golden and Ms. Graham, and we all

independently reached the same conclusion: namely, that Leapfrog intended to sue PIL.

Executed on this 17th day of July, 2008 in New York, New York.

Dorothy M. Weber

EXHIBIT A

TOWNSEND
*and*
TOWNSEND
*and*
CREW
LLP

San Francisco

Two Embarcadero Center
Eighth Floor
San Francisco, California 94111-3834
Tel 415.576.0200
Fax 415.576.0300

April 7, 2008

Mr. Richard G. Maddrell
President
Publications International, Ltd.
7373 N. Cicero Ave.
Lincolnwood, IL 60712

  Re: **Use of POINGO Trademark**

Dear Mr. Maddrell:

  We are intellectual property counsel to LeapFrog Enterprises, Inc. ("LeapFrog").

  It has come to our attention that Publications International, Ltd. ("PIL") intends to launch a reading pen product under the mark **POINGO** in August, 2008. As I presume you are aware, LeapFrog is also preparing to launch its own reader pen product in June, 2008.

  Please be advised that long before PIL announced the launch of its reading pen product, LeapFrog was using the mark **POINGO** for its own reader pen both internally and in presentations to retailers. As a result, LeapFrog has priority rights to the use of the mark **POINGO**.

  Furthermore, LeapFrog's long prior use of the coined mark **POINGO** within LeapFrog indicates that PIL's decision to use the same mark may be due to PIL's misappropriation of LeapFrog's confidential and proprietary information. Therefore, in order to determine whether PIL's use of the mark **POINGO** resulted from such a misappropriation, we request that you provide us with an explanation as to how PIL chose the mark **POINGO** for its reading pen product.

        Very truly yours,

        John A. Hughes

cc: Mr. Louis Weber

61333256 v1

# EXHIBIT B

SHUKAT ARROW HAFER WEBER & HERBSMAN, L.L.P.
ATTORNEYS AT LAW
111 WEST 57TH STREET
NEW YORK, NEW YORK 10019

ALLEN H. ARROW*
PETER S. SHUKAT
J. JEFFREY HAFER
DOROTHY M. WEBER
JONAS E. HERBSMAN

JASON A. FINESTONE
KYLE D.N. FOGDEN

TELEPHONE (212) 245-4580
TELECOPIER (212) 956-6471

*ALSO MEMBER CALIFORNIA BAR
WRITER'S E-MAIL:

dorothy@musiclaw.com

April 14, 2008

 4.14.08

<u>Via Facsimile (415) 576-0300</u>

John A. Hughes, Esq.
Townsend and Townsend and Crew, LLP
Two Embarcadero Center, 8th Floor
San Francisco, California 94111-3834

     Re:   POINGO
           <u>Publications International, Ltd.</u>

Dear Mr. Hughes:

     We are intellectual property counsel to Publications International, Ltd. ("PIL"). A copy of your letter dated April 7, 2008, has been referred to us for response.

     Please be advised that our client is not aware of any use by LeapFrog of the phrase POINGO. While you assert that LeapFrog has priority on the use of the mark POINGO, you have not provided any information on your claimed date of first use. Neither the LeapFrog's website nor any search of the internet reveals any use by LeapFrog of the phrase POINGO or any mark even similar to such phrase. While a search of your client's website reveals an optic pen children's book product under the trademark "TAG", no where in the description of the TAG product is the phrase POINGO referenced.

     Your claim that our client may have misappropriated confidential and proprietary information is a very serious claim and is potentially damaging to our client's business and goodwill. We caution any such allegations being made to third parties, particularly PIL's clients.

SHUKAT ARROW HAFER WEBER & HERBSMAN, L.L.P.

John A. Hughes, Esq.
April 14, 2008
Page 2 of 2

We ask, therefore, that you immediately provide us with any information which confirms a date of the purported adoption by your client of the mark POINGO, particularly any materials which you claim were shown to third parties.

This letter is written without prejudice to our client's rights and remedies, all of which are hereby expressly reserved.

Very truly yours,

SHUKAT ARROW HAFER WEBER
& HERBSMAN, LLP

Dorothy M. Weber

DMW: nvm

cc:    Mr. Lou Weber
       Mr. Dick Maddrell

# EXHIBIT C

TOWNSEND
*and*
TOWNSEND
*and*
CREW
LLP

San Francisco

Two Embarcadero Center
Eighth Floor
San Francisco, California 94111-3834
Tel 415.576.0200
Fax 415.576.0300

April 17, 2008

*VIA EMAIL TO <dorthy@musiclaw.com>*
*CONFIRMING COPY TO FOLLOW*

Dorothy M. Weber, Esq.
SHUKAT ARROW HAFER WEBER &
 HERBSMAN, LLP
111 West 57th Street
New York, NY 10019

> **Re:    Publications International, Ltd.**
> **Use of POINGO Trademark**
> Our File No. 025412-007700

Dear Ms. Weber:

We are in receipt of your letter dated April 10, 2008, regarding the above-referenced matter. In response to your request for additional information regarding LeapFrog's first use of the mark **POINGO**, please be advised that the mark **POINGO** was included in a presentation to one of LeapFrog's retailers at least as early as November 14, 2006, and LeapFrog used the mark internally prior to that date. As we previously stated, LeapFrog's long prior use of the coined mark **POINGO** indicates that PIL's decision to use the exact same mark may be due to PIL's misappropriation of LeapFrog's confidential and proprietary information. We therefore again request that you provide us with an explanation as to how and when PIL chose the mark **POINGO**, in order to assure LeapFrog that PIL's use of the mark did not result from any such misappropriation.

Very truly yours,

John A. Hughes

61344397 v1

# EXHIBIT D

**KELLEY DRYE & WARREN** LLP

A LIMITED LIABILITY PARTNERSHIP

**IOI PARK AVENUE**

**NEW YORK, NEW YORK IOI78**

(212) 808-7800

WASHINGTON, DC

CHICAGO, IL

STAMFORD, CT

PARSIPPANY, NJ

BRUSSELS, BELGIUM

AFFILIATE OFFICES
MUMBAI, INDIA

FACSIMILE
(212) 808-7897
www.kelleydrye.com

April 30, 2008

VIA FACSIMILE (415) 576–0300 AND EMAIL

John A. Hughes, Esq.
Townsend and Townsend and Crew, LLP
Two Embarcadero Center, 8th Floor
San Francisco, California 94111-3834

Re:     POINGO

Dear Mr. Hughes:

Please be advised that we have been retained by Publications International Ltd. as co-counsel to Shukat Arrow Weber & Herbsman, LLP in the above-referenced matter. In order to clarify the issues raised in your correspondence to date with Dorothy M. Weber, Esq., she and I would like to schedule a telephone conference with you this week or early next week.

We look forward to hearing from you.

Sincerely,

William R. Golden, Jr.

cc:     Dorothy M. Weber, Esq. (Via Email)

NY01/GRAHM/1281887.1

EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PUBLICATIONS INTERNATIONAL,
LTD.

                      Plaintiff,

v.

LEAPFROG ENTERPRISES, INC.

                      Defendants.

08-cv-2800

Judge Guzman

Magistrate Judge Cox

## DECLARATION OF WILLIAM R. GOLDEN, JR.

I, William R. Golden, Jr., declare as follows.

    1.     I am a partner in the law firm of Kelley Drye & Warren LLP and the Chair

of the Intellectual Property and Litigation Practice Group. I am admitted to practice

before the federal and state courts in New York and Connecticut, the Supreme Court, the

Federal Circuit Court of Appeals, the First, Second and Ninth Circuit Courts of Appeal

and the Northern District of Illinois. I have represented Plaintiff, Publications

International, Ltd. ("PIL"), in a prior suit in this district involving the defendant. I have

personal knowledge of the facts stated herein, except those that are stated on information

and belief, and can testify competently thereto.

    2.     On April 30, 2008, I sent Mr. Hughes a letter requesting that the parties

have a telephone conference to discuss the issues he had raised on behalf of his client

LeapFrog. A true and correct copy of that letter is attached hereto as Exhibit A.

3.    On May 7, 2008, I participated in a phone conference with Mr. Hughes, with my colleague Michelle Graham, Esq. and Dorothy Weber, Esq. who regularly represents PIL in intellectual property matters. Mr. Hughes never said during that conversation that LeapFrog would not sue PIL. The whole purpose of the telephone conference from my perspective was to determine what LeapFrog's intentions were and had he said that LeapFrog did not intend to sue, I am sure I would have remembered that statement.

4.    Instead, Mr. Hughes affirmatively stated at least three or four times that LeapFrog would get the information it wanted through discovery if PIL did not voluntarily conduct an investigation and provide him with the information he wanted concerning how PIL decided to use the POINGO mark.

5.    Dorothy Weber advised Mr. Hughes that the POINGO mark had been conceived by an outside consultant, but he refused to accept this statement. He stated that it was impossible that this was a coincidence. The implication was that Hughes believed he already knew what had happened was wrongful.

6.    My conclusion was that his message was that it was LeapFrog's intention to sue no matter what PIL did.

Executed on this 18th day of July, 2008 in New York, New York.

William R. Golden, Jr.

EXHIBIT A

**KELLEY DRYE & WARREN** LLP

A LIMITED LIABILITY PARTNERSHIP

101 PARK AVENUE

NEW YORK, NEW YORK 10178

———

(212) 808-7800

WASHINGTON, DC
CHICAGO, IL
STAMFORD, CT
PARSIPPANY, NJ

———

BRUSSELS, BELGIUM

———

AFFILIATE OFFICES
MUMBAI, INDIA

FACSIMILE

(212) 808-7897

www.kelleydrye.com

April 30, 2008

VIA FACSIMILE (415) 576-0300 AND EMAIL

John A. Hughes, Esq.
Townsend and Townsend and Crew, LLP
Two Embarcadero Center, 8th Floor
San Francisco, California  94111-3834

Re:   POINGO

Dear Mr. Hughes:

Please be advised that we have been retained by Publications International Ltd. as co-counsel to Shukat Arrow Weber & Herbsman, LLP in the above-referenced matter.  In order to clarify the issues raised in your correspondence to date with Dorothy M. Weber, Esq., she and I would like to schedule a telephone conference with you this week or early next week.

We look forward to hearing from you.

Sincerely,

William R. Golden, Jr.

cc:   Dorothy M. Weber, Esq. (Via Email)

NY01/GRAHM/1281887.1

EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PUBLICATIONS INTERNATIONAL,
LTD.

               Plaintiff,

v.

LEAPFROG ENTERPRISES, INC.

               Defendants.

08-cv-2800

Judge Guzman

Magistrate Judge Cox

## DECLARATION OF JULIE P. SAMUELS

I, Julie P. Samuels, am an attorney at Loeb & Loeb LLP and admitted to practice in this District. I am directly and actively involved in Loeb's representation of Publications International, Ltd. ("PIL") in *Publications International, Ltd. v. LeapFrog Enterprises, Inc.,* Case No. 08-cv-2800. I submit this declaration in support of PIL's Opposition to LeapFrog Enterprises, Inc.'s Motion to Dismiss.

1.     Attached as Exhibit A is a true and correct copy of a news story from Common Sense Media, dated February 27, 2008, that discusses PIL's POINGO™ electronic pen reading product.

2.     Attached as Exhibit B is a true and correct copy of a news story from ABC News, dated February 29, 2008, that also discusses PIL's POINGO™ electronic pen reading product.

Executed on this ⟨⟩th day of July 2008 in Chicago, Illinois.

EXHIBIT A





Reviews    Videos    Newsletter    Tips    Resources    Take Action    News    About Us

Help us improve our site. **Complete our survey**
and enter a drawing to win a $100 gift certificate!

Sign In

**Parent Tips**



**Tech Trends from Toy Fair**
**February 27, 2008**
**By Jinny Gudmundsen**

Last week we scoured the annual American International Toy Fair to find the coolest new tech trends. Here's the cream of the crop:

**More Virtual Worlds**

With the mega-popularity of *Webkinz*, expect to see many new virtual worlds for kids, including:

• ME2 (My Electronic Double, pronounced "Me Two"), coming in August from IToys. The handheld gaming unit ($34.99) -- which looks like an oversized pedometer -- combines playing in a virtual world with encouraging kids to exercise. The unit houses a tri-axis sensor that registers when kids are being active and translates that activity into Power Points that can be used to power up their avatar in a rich, vibrant 3-D online world. When they run out of Power Points, they'll need to run outside to play. The ME2 looks like a winner because it motivates kids to move while appealing to their great love of playing online.

• Later this year, Disney is rolling out *Disney Fairies Pixie Hollow*, a massively multiplayer game for kids that will have a commercial tie-in with Disney Fairies Clickables jewelry. The jewelry unlocks new content in the Pixie Hollow virtual world and also lets kids share content with friends: They simply touch-link two pieces of jewelry or trade charms that go on e-bracelets. Kids can already create a fairy by going to the *DisneyFairies.com* Web site.

**Pens That Read**

Three different companies are developing pen-like devices that house mini computer processors and optical sensors so that they can read words from special books:

• Tag from Leapfrog -- due out in June -- will launch with a library of 16 books. By touching the Tag device to a page, the device can read the book out loud. It can also read specific words, make fun character comments or ambient sounds when held over illustrations, and provide interactive games. ($49.99 for the pen and one book; ages 4-7)

• Poingo from Publications International launches in August with a library of six Disney books and will add more in October. The device will read the books or individual words and can recognize objects on the page to trigger other fun audio content. ($34.99 for a bundle that includes the pen and two books; ages 4-7)

• Cypher from Cold Fusion will launch with Brainy Baby books in late summer. Like the other reading pens, it too becomes an interactive reading device when paired with special books. ($24.99 for the pen, for ages 3-7).

return

# EXHIBIT B


**NEWS**

# Next Tickle Me Elmo? Fair Showcases Hot Toy Trends

**From Virtual Worlds to Dancing Games, the Newest Trends in Kids' Tech Toys**

By JINNY GUDMUNDSEN

Feb. 29, 2008 —

At last week's American International Toy Fair, many companies unveiled new tech toys scheduled to hit stores later in the year. We weeded through football fields of toys to find the ones that stood out from the rest.

### Virtual Worlds

With the popularity of Club Penguin and Webkinz, other toy makers are trying to tap into the virtual world craze. Here are two virtual worlds that are planning something different from those already playing in the virtual sandbox.

### ME2
*From iToys, $34.99, for ages 8-14, coming in August 2008*

While ME2 (pronounced "Me Too" which stands for "My Electronic Double") shares the popular Webkinz model of a physical toy providing you a presence in a virtual world, this toy/virtual world is refreshingly different because it is all about motivating children to exercise.

The ME2 handheld gaming device looks like an outsized pedometer and it operates in a similar manner. While kids can play simple arcade-style games on it using its full color LCD screen, the device's main purpose is to track children's physical activity and translate that activity into Power Points that are used in a virtual world. While carrying the device, any movement on a kid's part converts to Power Points stored in the device.

By plugging the ME2 into your computer via a USB connection, you transfer your stored points and enter a rich and vibrant 3-D virtual world. Developed, in part, with an advisory panel of 60 children ages 8 to 13, this world beckons you to explore different lush islands.

To play you create an avatar and then use your Power Points to make your avatar more powerful in areas of agility, jumping, speed, luck, and intelligence. The Power Points can also be used to buy currency in this world. For example, you may find you need a flashlight to explore a dark cave in the online world. To purchase the virtual flashlight, you will need to do something physical in the real world. So kids may hop on their bikes, play hop-scotch, or join a soccer game to earn enough Power Points to buy the flashlight.

This massively multiplayer virtual world will go into beta testing in June, and plans to roll out in August.

What Will Be the Next Tickle Me Elmo? Page 2 of 4

Case 1:08-cv-02800   Document 35-5   Filed 07/21/2008   Page 7 of 9

**Disney Fairies Pixie Hollow**

*From Disney Online, pricing to be announced, but some of the game will be free, and other parts will be supported by subscription, for ages 4-up, coming later in the year*

Disney (the parent company of ABC News) has already created a Web site that allows girls to create their own personalized fairy avatar at www.DisneyFairies.com, but later this year, that avatar will be able to play in a bigger, magical, massively multiplayer world called Disney Fairies Pixie Hollow.

As a fairy in Pixie Hollow, you will be able to explore homes and meadows, play and chat with other fairy friends, customize your own home and look, play games, and go on quests. Some of these quests will be to find famous fairies like Tinkerbell. Other quests can take you offline to pursue real world quests like recycling or making someone laugh.

"When playing in Pixie Hollow, girls not only view themselves as virtual fairies, but really think and feel that that they are, in some way, real world fairies," said Steve Parkis, senior vice president of Disney Online. "We believe it is important to give them the opportunity to continue the experience by expressing their 'inner fairy' in the real world, outside of the online experience."

When girls return online to report about their off-line quest, they will be rewarded within the virtual world.

Unique to this virtual world is the addition of Fairies Clickables, special collectible jewelry that houses new technology which, when touched to other Clickables, transfers information. Developed in partnership with Techno Source, this jewelry will come in the form of charms, charm bracelets, and necklaces that can be stored in a jewelry box which connects to the computer via a USB connection.

By simply clicking (touching) two charms together, girls will be able to pass on in-game items, unlockables, and fairy friendship information.

**Wii-Inspired Movement Games**

Parlaying the great success of the Wii, many toy companies are producing video games systems which require kids to move to play.

**V-Motion**
*From VTech, $69.99, for ages 3-7, coming in Fall of 2008*

Like the Wii, this gaming system for young kids uses a wireless controller that is motion sensitive. Kids play by moving the controller around, not simply pushing buttons.

But unlike the Wii, all of the games for this television plug-and-play system are educational. The new system will be launching with one game and eight add-on titles ($24.99 each) including ones featuring WALL-E and Kung-Fu Panda.

**Ulti-Motion**
*From Jakks Pacific, $79.99, for ages 4-up, coming in Fall 2008*

The Ulti-motion system is a television plug-and-play system that combines video gaming with role-playing toys. Like the Wii, it features a wireless motion controller which senses kids' motions as they play.

The system comes with a console that plugs directly into the A/V jacks of the TV, the wireless controller, and role-playing accessories that attach to the wireless controller to help further the imaginary play.

Parents will have three different packages to choose from. The "Ulti-Motion Swing Zone" is a sports package which will come with a bowling ball, football, baseball bat, tennis racquet, and golf club attachments. The other two packages will feature Disney properties including classic Disney Princesses and Playhouse Disney Preschool properties.

The role-playing accessories for these sets will reflect the theme of the product including a set of fairy wings and a wand that attaches to the controller in the Disney Princesses set.

### U-Dance
*From Tiger Electronics, $74.99, for ages 8-up, coming in Fall 2008*

Picking up on the "Dance, Dance Revolution" craze, Tiger Electronics has developed a way to mimic that gameplay without your having to own a gaming console and the corresponding dance mat controller.

By plugging the U-Dance console into your TV and then attaching special motion capture tags to your shoes, this game lets you become the dance controller. You are no longer limited to moves that you can make on a dance mat.

### Reading Pens

Several years ago, interactive book readers like the "LeapPad" and "Active Pad" were all the rage. The newest tool to help children read will be pen-shaped devices. Three are hitting the market this year:

### TAG
*From Leapfrog, $49.99, for ages 4-8, coming in June 2008*

The Tag is a pen-like device that houses a computer processor and optical sensor. When it is touched to the surface of a specially made book, it can read the whole page or individual words. It can also create fun sound effects when touched to illustrations. Other icons on the page can trigger interactive games.

Another bonus is that the audio reading of the book can be accompanied by musical interludes and original character voices.

The Tag system comes with one book, but Leapfrog is launching it with a library of 16 other classic children's books, which will sell for $13.99 each.

### Poingo
*From Publications International, Ltd, $34.99 (for a pen and two books), for ages 4-7, coming in August 2008*

This reading pen will launch with two Disney books: "Cars" and "Finding Nemo." Like the Tag, it can read the whole page or individual words.

Touching illustrations will trigger other exciting audio interactions. Add-on books available at launch will include four classic Disney books with more books coming in October.

### Cypher

*From Cold Fusion, approximately $24.99 (for the pen), for ages 3-7, coming late summer*

This reading pen will launch during the late summer with Brainy Baby books. Like the Tag and the Poingo, the Cypher instantly narrates or produces a fun sound effect when it is held over a word or picture on a page of a specially made book.

*Jinny Gudmundsen is the kid-tech columnist for Gannett News Service and USA Today.com, and is also the editor of **Computing with Kids Ezine**.*

Copyright © 2008 ABC News Internet Ventures