IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PUBLICATIONS INTERNATIONAL, LTD., an Illinois Corporation, | ) ) ) | Case No. 08CV2800 |
| | ) | Judge Guzman |
| Plaintiff, | ) ) | Mag. Judge Cox |
| v. | ) ) | |
| LEAPFROG ENTERPRISES, INC., a Delaware Corporation, | ) ) ) | |
| Defendant. | ) ) | |

**LEAPFROG ENTERPRISES, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS FOR LACK OF DECLARATORY JUDGMENT JURISDICTION UNDER 28 U.S.C. §2201 AND FOR FAILURE TO STATE A CLAIM UNDER RULE 12(B)(6)**

**I.   INTRODUCTION**

For months, PIL steadfastly has refused to disclose information in its sole possession related to its derivation of "POINGO," a mark that LeapFrog coined and used internally and in confidence. PIL of course was free not to disclose the information voluntarily, but it cannot simultaneously file a declaratory relief action alleging an "actual controversy" between the parties when LeapFrog made clear in all of its communications with PIL that LeapFrog needed the information to determine *whether* there was a controversy between them. In its opposition papers, PIL fails to surmount this hurdle, and instead focuses primarily on the irrelevant issue of all the preparations it allegedly is making to distribute "POINGO" goods. PIL fails also to overcome the patent deficiencies in its Illinois Consumer Fraud Act claim, which PIL only added to this case *after* LeapFrog made clear that PIL's declaratory relief claims were improper. Because PIL does not carry its burden to demonstrate declaratory jurisdiction and does not allege

a cognizable claim under the Consumer Fraud Act, the Amended Complaint should be dismissed.

## II.   PIL FAILS TO MEET ITS BURDEN TO SHOW AN ACTUAL CONTROVERSY

### A.   PIL's Preparations to Use POINGO Do Not Support Declaratory Jurisdiction under the *MedImmune* Standard Absent an "Actual Controversy" with LeapFrog

PIL spends much of its Opposition trying to establish that it has made extensive preparations to distribute POINGO-branded goods.  (PIL Memo. at 6-11.)  However, such preparations are irrelevant to jurisdiction here because PIL cannot show an actual controversy with LeapFrog.  PIL, as the proponent of federal declaratory judgment jurisdiction, has the burden to demonstrate with objective facts, not with hunches and unfounded impressions, that LeapFrog *threatened* PIL's alleged plans.  *See Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 96 (1993).  The Supreme Court's *MedImmune* decision did not suspend the requirement of an objective threat posed by the declaratory defendant, as PIL seems to suggest.[1]  Though, in *MedImmune*, there was no threat of a lawsuit so long as the plaintiff-licensee had paid royalties, the Supreme Court emphasized that it was "clear" the patent holder would have sought "to enjoin sales if royalties were not forthcoming."  *MedImmune*, 127 S.Ct. at 772.  Thus, in *MedImmune* there was no question that the defendant patent holder was unambiguously threatening the licensee with legal claims and that the licensee thus was faced with the choice either to continue to pay money it believed it did not owe or to stop paying and provoke an infringement suit.  That certainly was not PIL's situation when it filed suit.

---

[1]   PIL implicitly acknowledges this jurisdictional requirement through its witnesses who state repeatedly that they believed LeapFrog was threatening to sue PIL. (*See* Golden Decl., ¶6, D. Weber Decl., ¶8.)

Likewise, post-*MedImmune* cases (including those cited by PIL) still emphasize that declaratory plaintiffs must show an adverse party's clear assertion of legal claims that would jeopardize the plaintiffs' course of conduct. *See, e.g., SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1383 (Fed. Cir. 2007). Though *MedImmune* replaced the Federal Circuit's "reasonable apprehension of suit" test with a more flexible analysis,[2] courts continue to require objective evidence of an assertion of legal rights jeopardizing the declaratory plaintiff's plans, just as the patent holder in *MedImmune* had threatened the plaintiff. In some instances, plaintiffs have satisfied the "threat" prong of the jurisdictional test by pointing to the fact that the intellectual property owner had already filed an infringement claim against the plaintiff and/or others.[3] In other cases, there was a history of correspondence charging infringement and unambiguous demands that the plaintiffs either pay royalties or cease their infringing activities.[4] In *SanDisk*, for example, the court found that the patent holder had "engaged in a course of conduct that shows a preparedness and willingness to enforce its patent rights." *SanDisk Corp.*, 480 F.3d at 1383. The defendant's course of threatening conduct included: (1) conducting "a studied and considered determination" of SanDisk's alleged infringement; (2) clearly

---

[2] *See Sony Electronics, Inc. v. Guardian Media Tech.'s*, 497 F.3d 1271, 1283 (Fed. Cir. 2007) (*MedImmune* did not articulate "a bright-line rule for distinguishing those cases that satisfy the actual controversy requirement from those that do not").

[3] *See, e.g., Cal-Tech LLC v. Tubemaster, Inc.*, 528 F.3d 871 (Fed. Cir. 2008) (declaratory defendant had sued for infringement); *Micron Techn., Inc. v. Mosaid Tech.'s, Inc.*, 518 F.3d 897 (Fed. Cir. 2008) (declaratory defendant had sued other similar parties on the same patents); *Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1344 (Fed. Cir. 2007) (jurisdiction originally established by defendants' infringement claims which, when withdrawn, eliminated basis for jurisdiction); *Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*, 482 F.3d 1330, 1340 (Fed. Cir. 2007) ("Novartis had already filed suit based on Teva's act of infringement in submitting the ANDA").

[4] *See, e.g., Sony Electronics, Inc. v. Guardian Media Tech.'s*, 497 F.3d 1271 (Fed. Cir. 2007); *SanDisk Corp.*, 480 F.3d at 1383.

communicating the infringement conclusion to SanDisk; (3) demanding millions of dollars in patent royalties from SanDisk; and (4) attending meetings where it detailed to SanDisk how "one or more claims of its patents read on one or more of SanDisk's identified products."[5] *Id.* at 1382.

Here, no such objective indicia of a threat was present at the time PIL filed its complaint or at any time. LeapFrog never charged PIL with trademark infringement or with trade secret misappropriation, orally or in letters. PIL does not, and cannot, point to any evidence to the contrary. (*See* Exhibits A, C to Amended Complaint; Hughes Decl., ¶8.) LeapFrog never demanded that PIL stop using POINGO, nor demanded that PIL pay LeapFrog royalties. LeapFrog's attorney wrote that LeapFrog believed it had coined and first used the POINGO mark and, based on this belief, sought an explanation as to how PIL came up with the mark "in order to determine whether PIL's use of the mark POINGO resulted from ... misappropriation."[6]

---

[5] The details of the meeting in *SanDisk*, in sharp distinction to the phone call between PIL's and LeapFrog's attorneys, clearly established that defendant "ST" was fully prepared to assert its patent claims. At the meeting, ST "presented SanDisk with a detailed presentation which identified, on an element-by-element basis, the manner in which ST believe each of SanDisk's products infringed the specific claims of each of ST's patents. [They] liberally referred to SanDisk's present, ongoing infringement of ST's patents, and the need for SanDisk to license those patents. ST also gave SanDisk a packet of materials, over 300 pages in length, containing, for each of ST's fourteen patents under discussion, copy of the patent, reverse engineering reports for certain of SanDisk's products, and diagrams showing a detailed infringement analysis of SanDisk's products. ST communicated to SanDisk that it had made a studied and determined infringement determination and asserted the right to a royalty based on this determination." *SanDisk Corp.*, 480 F.3d at 1382.

[6] LeapFrog's only communication that could be interpreted as even remotely referring to its trademark rights is one sentence in Mr. Hughes' April 7 letter that LeapFrog "has priority rights to the use of the mark" based on LeapFrog's belief that it had coined and first used POINGO. This could not constitute assertion of a legal claim, however, because LeapFrog's initial statement of trademark priority never resulted in its claiming that PIL infringed, or in demands that PIL not use, the mark. Indeed, as PIL alleges, LeapFrog ultimately did *not* use the mark POINGO on LeapFrog's reader pen released in June 2008. (Complaint, ¶13.) Under all the cases cited by the parties, LeapFrog's statements about possible trademark priority do not constitute an "assertion of legal rights" placing PIL in the jeopardy that is required for declaratory jurisdiction.

4

(*See* Exhibit A to Amended Complaint.)  In every communication with PIL, LeapFrog stated that PIL's decision to use POINGO "**may be**" a result of misappropriation.  (*See* Exhibits A, C to Amended Complaint; Hughes Decl., ¶8.)  Objectively, these are not that words of one intending to threaten PIL with suit or other legal jeopardy, but the statements of one genuinely seeking an explanation of troubling circumstances.

      **B.**      **PIL's Subjective Belief that LeapFrog Intended to Sue PIL Is Not Sufficient to Sustain Federal Jurisdiction, In Light of Objective Evidence to the Contrary.**

Though it lacks objective evidence of any threat, PIL nonetheless offers the subjective beliefs and unsubstantiated mental impressions of three attorneys.  Attorney Golden declares that "it was LeapFrog's intention to sue no matter what PIL did."  (Golden Decl. ¶6.)  Attorney Weber opines that it was "apparent" to her based on Mr. Hughes' "tone" during the phone call, that "LeapFrog intended to pursue its legal remedies in Court," and that attorneys Golden and Graham "independently reached the same conclusion."  (D. Weber Decl. ¶¶8-9.)  These statements purporting to divine LeapFrog's intent from the "tone" of the call lack any foundation, rely impermissibly on hearsay, and add nothing to the Court's jurisdiction analysis.[7]  It is well-established that a party's subjective belief that another harbors an intention to sue cannot sustain declaratory judgment jurisdiction when the record is devoid of evidence of such an intention.[8]  *See City of Los Angeles v. Lyons,* 461 U.S. 95, 107 (1983) ("It is the reality of the

---

[7]    Weber's assertions at paragraphs 8 and 9 of her declaration as to Ms. Graham's mental impressions and legal conclusions reportedly shared during a conversation among PIL's attorneys are inadmissible hearsay, and LeapFrog objects to these assertions.  *See* Fed. R. Evid.  804.  Moreover, Ms. Weber's statements at paragraphs 8 and 9 and Mr. Golden's statement at paragraph 6 of his declaration -- each purporting to attest to LeapFrog's intent -- lack foundation, and LeapFrog objects.  *See* Fed. R. Evid. 104.

[8]    There certainly is no indication from the Supreme Court that *MedImmune* intended to replace an objective standard for jurisdiction with a wholly subjective one.

threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions"); *Indium Corp. of America v. Semi-Alloys, Inc.*, 781 F.2d 879, 883 (Fed. Cir. 1985) ("A purely subjective apprehension of an infringement suit is insufficient to satisfy the actual controversy requirement.")

Here, the unchallenged objective evidence is that never during the communications with PIL did LeapFrog "threaten litigation, charge PIL with infringement, demand monetary damages, demand that PIL not use POINGO, or even assert that PIL did in fact misappropriate the term POINGO." (Hughes Decl. ¶8.) All the correspondence in the record confirms this and, indeed, PIL does not offer any contradictory evidence. PIL merely suggests a different, unreasonable gloss on Mr. Hughes' statements during the phone call that the information "could"[9] be obtained in "discovery." In retrospect, it is fairly clear that PIL's attorneys were attempting in this conversation to bait Mr. Hughes so PIL could race to the courthouse. Despite the bait, Mr. Hughes without dispute did *not* threaten a lawsuit and mentioned discovery only to highlight that the information LeapFrog was requesting was basic to LeapFrog's evaluation of the parties' respective legal positions. (Hughes Decl., ¶7.) PIL's seizing on this word to manufacture federal declaratory jurisdiction is not supported by the pre- or post-*MedImmune* case law, which consistently has required a party's unambiguous assertion of legal rights and threatened jeopardy. Indeed, no cases -- and PIL cites none -- support the notion that a party's request for "discovery" is all that is needed to justify federal declaratory jurisdiction.

---

[9] PIL's Amended Complaint alleges that Mr. Hughes said LeapFrog "could" obtain the information in discovery. (Amended Complaint, ¶25.) PIL's declarants now try to change this to "would," though not actually purporting to quote Mr. Hughes. (D. Weber Decl., ¶6); (Golden Decl., ¶4.)

6

This is all the more clear because Mr. Hughes' request for discovery could have related only to a potential state misappropriation claim, a cause of action over which the Court would have no federal declaratory jurisdiction.[10]  As PIL acknowledges, LeapFrog's request for "discovery" was for the purpose of determining *whether* PIL had misappropriated the term "POINGO."  (*See* D. Weber Decl., ¶¶6-7; Exhibits A,C to Amended Complaint.)  Even if Mr. Hughes' request for discovery somehow could be interpreted as tantamount to a threat to sue, it could only have been a threat to sue for misappropriation.  Thus, this statement would not show an intent to sue on a federal claim and could not support federal declaratory relief jurisdiction.

Ultimately, the declared belief of PIL's attorneys that LeapFrog harbored an unexpressed intent to sue simply is not reasonable in light of LeapFrog's repeated requests for basic information about PIL's derivation of POINGO.  A party that emphasizes its need for additional evidence in all its communications is not showing an intention that it is prepared to bring legal claims, but its opposite.  *See, e.g., Wright Medical Tech. v. Osteonics Corp. and Stryker Corp.*, 914 F. Supp. 1524, 1531 (W.D.Tenn. 1995) (requests to examine allegedly infringing device should have conveyed to plaintiff that defendants "lacked vital information and could not be leveling a charge of infringement").  Plainly, LeapFrog could not have been asserting legal claims, because it expressed a need for the information to determine whether it had claims.

The only permissible conclusion from the evidence is that LeapFrog was *investigating* possible misappropriation of the mark, which under controlling Seventh Circuit authority does not establish federal declaratory jurisdiction.  *See American Needle and Novelty Co. v. Schuessler Knitting Mills, Inc.*, 379 F.2d 376, 379 (7th Cir. 1967).  In that case, the Seventh

---

[10]   *See Nationwide Ins. v. Zavalis,* 52 F.3d 689, 692 (7th Cir. 1995).

7

Circuit held that a party "should have the privilege of making a fair investigation . . . without calling down on its head the undertaking of a defense of an expensive and burdensome declaratory judgment suit . . . ." *Id.* PIL's half-hearted attempt to distinguish this Seventh Circuit precedent misses the mark. (PIL Memo. at 9.) Contrary to PIL's arguments, the *MedImmune* Court did not invalidate all prior declaratory judgment authorities -- indeed PIL cites several in its Opposition -- and there is no indication that the Supreme Court with its decision intended to overrule precedents that encourage parties to investigate potential claims before filing. Moreover, that LeapFrog's attorneys sent *two* letters instead of *one* is not a substantive distinction and in no way suggests that LeapFrog's inquiry was any less of a genuine investigation than that of the declaratory defendants in *American Needle* or the other cases cited by LeapFrog.

LeapFrog sent PIL the follow-up requests for information about PIL's derivation of POINGO precisely because PIL, despite repeated requests, did not offer any explanation as to how it had adopted a name that LeapFrog had coined and used confidentially many months before. Even now, nearly four months after LeapFrog first asked, PIL has not come forward with any information that would explain how its adoption of "POINGO" could have been simply a remarkable coincidence. Its Amended Complaint contains not a shred of information on this critical issue.[11] Only PIL knows how it came up with "POINGO," and it may well be that its undisclosed knowledge created such uncertainty within PIL regarding its right to POINGO that it believed the prudent course was to seek a judicial declaration respecting its conduct. Had there

---

[11] For that reason alone, as LeapFrog argued in its Motion, PIL's claim for a declaration of non-misappropriation is too lacking in specificity to support declaratory relief jurisdiction. (*See* Motion at 9-10.) PIL's Opposition fails to refute this argument altogether.

been an innocent explanation and had PIL provided it to LeapFrog, the parties might have avoided litigation and utilizing judicial resources.[12] However, PIL's failure to disclose its knowledge to LeapFrog, and the apparent corporate nervousness that this aroused, is not a sufficient basis for federal declaratory jurisdiction.

### C. PIL Fails To Establish that its Preparations to Use POINGO Were Advanced Prior to Its Filing the Complaint.

Whether PIL is, or is not, at an advanced stage in distributing POINGO-branded products is irrelevant here because PIL has not shown a justiciable actual controversy between it and LeapFrog. Even if PIL now had products in the stores and on the shelves ready for sale, declaratory relief jurisdiction still would be lacking. Assuming for the sake of argument that PIL's state of preparations was relevant, PIL's evidence comes up short because it does not establish that its preparations were advanced *before* May 14, 2008, when it filed the Complaint. *Trippe Mfg. Co. v. American Power Conservation Corp.*, 46 F.3d 624, 627 (7th Cir. 1995). Though Mr. Weber's declaration recites a number of activities related to production of POINGO products, only the February 2008 "Toy Fair," where PIL announced POINGO, and a couple related web articles, clearly occurred before PIL filed the Complaint. (*See* L. Weber Decl., ¶¶2-9.) PIL's having announced its intention to use a trademark constitutes no more preparation than

---

[12] PIL halfheartedly hints at an explanation in its opposition papers, but the statements of its declarants on this point are inconsistent, ambiguous, and hardly exculpatory. PIL chief executive Louis Weber states, "With the assistance of a third-party branding company, PIL chose the name POINGO," but this statement is significant for what it omits: any mention of which party first conceived the name that the consultant helped PIL to choose. (L. Weber Decl., ¶3.) On the other hand, William Golden, PIL's outside litigation counsel, declares that another attorney, Dorothy Weber, "advised" Mr. Hughes that the mark "had been conceived by an outside consultant." (Golden Decl., ¶5.) Significantly, Ms. Weber would not include in her own declaration the incompetent statement that Golden attributed to her. (D. Weber Decl., ¶¶5-7.) Not only is Golden's statement inadmissible hearsay, there is no foundation supporting how Attorney Weber would have known who conceived of POINGO when PIL's own chief executive apparently did not. LeapFrog objects to this inadmissible statement in paragraph 5 of Mr. Golden's declaration. *See* Fed. R. Evid. 104, 804.

the unsuccessful plaintiff undertook in *Geisha*, where this Court held that "allegedly infringing future activity lacks sufficient immediacy and reality" to warrant declaratory relief. *Geisha*, 525 F. Supp. 2d at 1018. (*See* Motion at 8-9.)

### III. PIL FAILS TO OVERCOME THE DEFICIENCIES IN ITS CONSUMER FRAUD ACT CLAIM.

The parties are in agreement that PIL must allege a consumer nexus, and the parties further agree that PIL fails to allege LeapFrog disseminated to consumers the contents of its letters to PIL. The parties dispute, however, whether such a failure is fatal to PIL's Illinois Consumer Fraud Act claim. In the absence of publication of LeapFrog's statements to consumers, PIL offers a different, and wholly untenable, theory of consumer nexus for its claims: that LeapFrog's so-called "threats" to PIL somehow will cause PIL to withdraw its POINGO product from the market, thereby indirectly limiting consumer choice. In other words, PIL asks this Court to endorse a legal theory that would turn every trademark inquiry letter – or any letter seeking clarification of rights between competitors – into a Consumer Fraud Act claim.

PIL's consumer nexus theory fails to save its claim because it is not supported by the allegations of the Amended Complaint, nor consistent with the evidence PIL has offered, nor authorized by any cases decided under the Illinois Consumer Fraud Act. The theory directly conflicts with PIL's evidence offered in defense of its lawsuit. As attested by the declaration of PIL's chief executive Louis Weber, PIL's alleged concerns raised by LeapFrog's letters are "the reactions of third parties" to LeapFrog's statements, not, as PIL's attorneys now argue, that PIL will be compelled voluntarily to withdraw its product. (L. Weber Decl., ¶10.) Absent any allegation that LeapFrog published the content of its letters, there can be no Illinois Consumer Fraud Act claim arising out of PIL's announced concern about third parties' "reactions."

10

Moreover, nowhere in the Amended Complaint or in PIL's declarations does PIL allege that it is contemplating withdrawing the POINGO product due to LeapFrog's so-called "threats." To the contrary, all of the evidence in the record is that PIL is moving forward expeditiously with plans to roll-out POINGO products to as many as "10,000 stores." (L. Weber Decl., ¶9.) Furthermore, though PIL in its brief loosely refers to LeapFrog's "threats," "bullying," and supposed "scare tactics," there are no allegations of true threats or bullying, but simply the letters attached to the Amended Complaint and a phone call among lawyers. In none of these communications are there any statements that fairly can be characterized as threats or intimidation.

In addition, no court has come close to endorsing such an indirect and entirely derivative form of consumer nexus as that proposed by PIL's theory. In *Junction Solutions*, *LLC v. MBS Dev, Inc., et. al.,* 2007 U.S. Dist. LEXIS 86953 (N.D. Ill. Nov. 20, 2007) -- a case that PIL mischaracterizes as a "fraud" case (*see* PIL Memo., n. 5) -- the court dismissed a counterclaim based on conduct just like the alleged wrongful conduct that PIL asserts it in Amended Complaint. In *Junction Solutions*, the defendant asserted that plaintiff's having sent a letter to defendant's business partner "accusing" defendants of trade secret misappropriation violated the Illinois Consumer Fraud Act on the theory that such conduct indirectly implicated consumer concerns. The court expressly rejected defendant's claim, holding that plaintiff's alleged "accusations," even to a party outside of defendant itself, were not directed to the marketplace and as such, did not implicate consumer protection concerns. *Id.*, at *20.

Additionally, PIL's reliance on *Pace Am., Inc. v. Elixir Indus.*, 2007 U.S. Dist. LEXIS 10601 (N.D. Ill. Feb. 13, 2007), and *Gold v. Golden G.T., LLC*, 2005 U.S. Dist. LEXIS 22691 (N.D. Ill. Oct. 4, 2005) is misguided. In *Pace*, the court dismissed plaintiff's claim under the

Consumer Fraud Act because plaintiff failed to sufficiently allege that the defendant's conduct implicated consumer protection concerns. Even though plaintiff asserted that it was "one of the largest manufacturers of enclosed cargo and auto trailers," the court expressly declined to "extend…[this reasoning] to suggest that the alleged deception by defendant would affect the ultimate consumers." *Pace*, 2007 U.S. Dist. LEXIS 10601 at *13. Similarly, PIL's assertion that LeapFrog's conduct somehow implicates consumer concerns does not give rise to a Consumer Fraud Act claim.[13]

Not only has PIL not supplied the required consumer nexus, it also has failed to allege practices that qualify as "unfair" under the Act. Try as it might, PIL cannot turn LeapFrog's letters seeking information about "POINGO" into a practice that (1) offends public policy; (2) is immoral or oppressive; or (3) causes substantial consumer injury. All of the authorities PIL relies on for the "public policy violation" illustrate conduct that constitutes a public policy concern precisely because it violates an existing statute. In *Sadowski*, for example, the court held that sending unsolicited faxes with misleading advertising constituted a public policy concern "because sending unsolicited faxes is considered unlawful under both the TCPA and Illinois law, 720 ILCS 5/26-3." *Sadowski v. Med1 Online, LLC.*, 2008 U.S. Dist. LEXIS 41766 at *19 (N.D. Ill. May 27, 2008).

Nor do PIL's allegations establish oppression or substantial consumer injury. It simply is not reasonable to infer from the Amended Complaint that LeapFrog's statements to PIL will oppress or burden consumers, and the sole case that PIL cites does not in any way support its

---

[13]   Similarly, in *Gold*, the court found that the defendant's conduct was directed to the market generally and thus, it declined to reach the issue of whether the alleged conduct otherwise implicated consumer protection concerns. *Gold*, at *15, n. 4.

position.[14] PIL's original complaint did not include the Illinois Consumer Fraud Act claim. PIL added it only after LeapFrog wrote PIL detailing the reasons why there was no declaratory jurisdiction on the original claims. Apparently, PIL simply threw this affirmative claim into the Amended Complaint in a desperate effort to avoid outright dismissal of its federal lawsuit. PIL's attempt to fashion a claim on an improper legal theory that conflicts with its own evidence and distorts the Illinois Consumer Fraud Act should be rejected.

---

[14]     *Centerline Equip. Corp. v. Banner*, 545 F.Supp. 2d 768 (N.D.Ill. 2008) does not provide support for PIL's contentions. In *Centerline*, the court held that the practice of sending unsolicited faxes deprives consumers of choice because "they cannot avoid such faxes." *Id*. at 780. In contrast, PIL alleges no such imposition on consumers. The *Centerline* court further observed that sending unsolicited faxes to many consumers, in the aggregate, caused a substantial injury to consumers because it imposed "costs on unwilling consumers, by wasting paper and toner, wearing down fax machines, and consuming employee time." *Id*. Here, PIL summarily alleges that LeapFrog's conduct somehow will raise prices and therefore cause a substantial injury to consumer. PIL's link between LeapFrog's conduct and raised prices to consumers downstream who may purchase the pen-reader product is far too attenuated and beyond the type of conduct which any court has endorsed as actionable under the Consumer Fraud Act.

DATED:  August 4, 2008		Respectfully submitted,


		_____/Michele S. Katz/_____
		Julie A. Katz, Esq. (Illinois Bar No. 6204541)
		Michele S. Katz, Esq. (Illinois Bar No. 6273985)
		**WELSH & KATZ, LTD.**
		120 S. Riverside Plaza, 22nd Floor
		Chicago, IL  60606
		Tel:		(312) 655-1500
		Fax:		(312) 655-1501
		E-mail:		jakatz@welshkatz.com

		Timothy R. Cahn, Esq. *(appearing pro hac vice)*
		**TOWNSEND AND TOWNSEND AND CREW LLP**
		Two Embarcadero Center, Eighth Floor
		San Francisco, CA  94111-3834
		Tel:		(415) 576-0200
		Fax:		(415) 576-0300
		E-mail:		trcahn@townsend.com

		*Attorneys for LeapFrog Enterprises, Inc.*

14